May it please the Court. Petitioner pleads that this Court reverse the Board of Immigration Appeals' decision denying her motion to reopen to apply for asylum due to changed country conditions. This decision was an abuse of discretion and contrary to this Court's decision in Malti v. Ashcroft, in which the Court held that the question is not whether the changed circumstances relate to the original asylum application. Why don't you just keep your voice up a little? In which the decision was contrary to this Court's ruling in Malti v. Ashcroft, in which the Court held that the critical question is not whether the changed circumstances relate to petitioner's original asylum application. Rather, the critical question is whether the circumstances have changed sufficiently that a petitioner who previously did not have a claim, a legitimate claim for asylum, now has a well-founded fear of persecution. In this case, petitioner is a 60-year-old woman from Iran who entered the United States in 1986. She had her asylum hearing before the Immigration Court in Los Angeles on April 11, 2000. Since that time, the human rights record in Iran has worsened severely, and several events have transpired that have changed the condition, particularly the September 11 terrorist attacks of 2001, the Access of Evil Declaration of Iran in January 2002 by President Bush, the success of hardliner candidates in Iran, and the renewed backlash against the reform movement and restrictions. Every woman in Iran would have the right to asylum in the United States. Isn't that correct? Well, Your Honor, what makes this case different is that petitioner has been in the United States for 20 years. She is a fashion designer. And that occupation on – that combined with the recent crackdown on women's attire and restrictions on women's rights places her in a unique position that's different from the general women population of Iran. Well, certainly, let's cut it down. All the women in Iran have been in the United States or have been there for very long or have lived in Europe or are, in quotes, westernized. And they qualify under your description, right? Well, not only that, but she is also an outspoken critic of the current regime in Iran. And she submitted in her declaration that she has a well-founded fear of returning. Well, but this is all Johnny-come-lately stuff. I mean, she was not an activist. She was not a protester before she got into this case, was she? No, Your Honor. Basically, this – I mean, I really have a lot of empathy for your client. I really do. And I have a lot of empathy for almost all the women in Iran. But the fact of the matter is we're bound by our case law. We're bound by the statute, whether we like it or not. And unfortunately, in this case, without an individualized experience of persecution there, I don't see how you make your case, counsel. Why am I wrong? Well, Your Honor, the circumstances after her hearing and – appear that she would now have a well-founded fear. Well, it appears. It's all speculative. The reality is it's a two-part situation. She has to have experienced it personally. I admit that changed conditions in the country can affect it. But you've got to have both parts. You've only got one part here. Well, based on the analysis from Malti Ashkoff, although at the time of her hearing in April 2000, she didn't – even if at that time she did not have a legitimate claim for asylum, she now appears to have one due to the changed circumstances. And even the fear appears to be – it is well-founded. In addition to these events, other – Yes, Your Honor. I mean, I think it's fair to say that she would – if she were there, she wouldn't wear the garments where your head is covered and all you can see is through a slit, that she would – would wear Western clothes, that she would advocate for women's rights, and that nothing would stop her from doing that. And because of the terrible conditions that exist there with the change of the regime – and we've got some hardliners over there and it's a bad place – that a person like her would surely be persecuted by the authorities. Well, yes, Your Honor, that is our position as well. And not only that, but there's also other events that have transpired in Iran since her previous hearing. And that includes a group of women being lashed 50 times for listening to loud music. And the recent crackdown on – there's also been a change in the referendums and reform movements that have – that were previously in effect under the new administration. And parliament representatives, they have moved to restricting women's freedoms and social rights since – and this evidence was not available at her original hearing. Now – Counsel, just to reiterate, though, your client was not an activist in Iran, she was not a participant in any political organization, and she never had any problems in Iran before she left. Is that correct? That is correct, Your Honor, but she is an outspoken critic of the – Currently. Current regime, yes. But not in Iran. She's been here. Well, yes, Your Honor, here. But if she were to return to Iran, she may be perceived – But what you're asking us to do is to change the law in a way that it's entirely speculative. Anybody from any country, based upon the law that you are proposing that we in effect enact, could say, you know, if I were back in whatever country, I would do X, Y, and Z. Well, that would get me in trouble. Therefore, I'm entitled to asylum. Your Honor – Is that what you're asking us to do? No, Your Honor. What I am asking for is this Court to follow the same analysis that it rules for in Malti v. Ashcroft. Malti involved a different factual situation, didn't it? Well, it's very similar. It's the – it was a Christian applicant who later – from Egypt who later submitted declarations and affidavits and news reports about the increase in violence against Catholic Christians. But who had been involved in activities in Egypt, right? Well, the Court's decision relied on the fact that he was religious – on his religion. But it occurred in Egypt. Yes. His problems occurred in Egypt. Yes. So he has the predicate of having been there, done the things that they were concerned about. Your client has not been in Iran doing the things that she is concerned about. Right. But as her length of residency, occupation, and her political – imputed political opinion, that she is against the current regime, and she believes that – What you're arguing for, as far as the – you know, her status, the class that she'd fallen to, you're asking the BIA to determine – because you want the case reopened, you want to go back to the BIA – to determine, in the first instance, whether a westernized Iranian woman who was a long-term resident of the United States – how long has she been here, 20 years? Twenty years. And how old is she now? Sixty. Sixty. And does she have a family over there? Sisters and brothers. Sisters and brothers. No one living here. Have any of them had any problems? Well, her sister was forced to – Well, you know I shouldn't have taken a deep breath then. But – all right. But she – so that's what she's really arguing, that a westernized Iranian woman who's lived here for a long time, 20 years, who opposes the way women are treated in that country, the dress code, and she – her argument is that she's in a – and that's the particular social group that she's a member of. Well, yes, Your Honor, and her – Pardon? Yes. And, well, her imputed political opinion of being against a regime in Iran would also be a ground – one of the five enumerated grounds for which she may apply for asylum. But what's important is that the – We know there's a lot of – there's a lot of tension in that country. We see it on television where people who were opposing the present regime demonstrate. You know, the police come out. The army comes out. The court securities officers come out. They take care of them. And so – They have court security officers over there? Yeah. That was – that was – yeah, they do. And – no, I just – it's a bad – it's a bad joke, so – but they're great. The court security guys are great. But they're evil. Yeah. I love every one of them. And so I'm trying to get a little humor into this. Everybody's so – why is everyone so grim out there today? And so that's – that's what we're worried about, huh? Yes, Your Honor, and – Yeah, I know my own street. One of my neighbor's brother was killed during the recent, as they say in Northern Ireland, troubles. But – all right. You want to save some time for rebuttal? Yes, Your Honor. All right. Thank you. Let's hear from the government. Good morning, Your Honors. Jeffrey L. Mencken, United States Department of Justice, for the Attorney General. May it please the Court. The issue here is not whether – let me step back. Based on the discussion, the Court here in 2004 already determined that the Petitioner did not qualify for asylum. And the question here is whether there have been changed circumstances since that hearing. And the Board very specifically looked at the evidence that was before the immigration court in 2000. And I draw the Court's attention to one thing that the Board cited, and that is the 1999 country report, which was in evidence before the immigration judge. And there's a passage on – in the record at 446, which also appears at 263, that says the following. Women are subject to harassment by the authorities if their dress or behavior is considered inappropriate. It later says that there are penalties for failure to observe Islamic dress codes at work. The identical passage appears in the 2003 country report in the record at 171. So to the extent as to whether the Board abused its discretion in finding that conditions hadn't changed, I think that there's – the record supports that conclusion. The conditions haven't changed in the past five years. That's the evidence, Your Honor, that the conditions – That's ridiculous. Well, we're not working off intuition, Your Honor. We're working off the record that was introduced. Oh, I'm not working off intuition either. Well, Your Honor, we have a record. And if we look at that record, the question is, did the motion – That's what she wants to do. She wants to have an opportunity to reopen and introduce. Right. And you don't get it. So what's wrong with that? Because, Your Honor, you don't get there unless you prove that your motion should be granted. And the Board found in its discretion, its very broad discretion. At what point, counsel, did the record close? So the marginal changes in the record have to be from what point? Well, according to Malte, it talks about whether the changes have since the immigration court hearing. Which would have been when? 2000. I don't recall the month. Immigration court hearing was 2000. Yes. A lot of changes have happened. Right? If we were to go out and research the issue, we might be able to find out. We don't have to research it. You know, don't you read the papers? The papers are not enough. Well, we can take judicial notice of what's happened in this world. Well, Your Honor, even – Maybe in the Justice Department they just close their eyes. Well, Your Honor, no. And this is my response to that. The challenge – the question is whether women are badly treated in Iran. That was in the record in 2000. That was in the record when this Court affirmed the removal order in 2004. Do we revisit that issue and based on what? The idea that it remains bad is not enough. The idea that it's not a place that I would want to move to or the Court might not want to move to, yeah, that's great, but so is most of the rest of the world. What did you say? The question here is not whether Iran is a bad place. If Iran was a bad place, would qualify everybody who lives there for asylum, then we'd need a bigger courtroom. We'd need a bigger what? Courtroom, Your Honor, because we'd have many more. I like this cozy courtroom. I actually do, too, Your Honor. Good. As far as whether being westernized is a social group, this Court has already said, and I sent her a 28-J letter quoting the Tufli case, which says that the Court has never recognized pro-western as a social group protected against persecution. Well, this is – we're not just looking at pro-western as a social group. We're talking about a woman who has come here and has lived here for 20 years, that is part of our culture now. And do you think she has at least a 10 percent chance of being persecuted if she goes back to Iran? Your Honor, that issue was decided by the Court in 2004. I'm talking about the social group now. So you can define it by more than one characteristic. There's no allegation, Your Honor, of a change. Do you agree to that? I'm not certain what the Court's question is, but there's no allegation that – I wouldn't disagree that women is a social group in general concept. The question is whether there is different evidence of a change since this last – this case last came around that would qualify her for reopening. And the Petitioner very distinctly attempts to separate herself from just women in general by saying that she is a westernized woman. And I think that it would be wrong for the Court to create an exception for people who remain in this country a long time out of status. And this Petitioner has been out of status since 1987 when her visa expired. So there's no such thing as somebody who's been here too long to be – to have the law carried out. There are many other points, but what this is is a failure of proof. There's a failure of proof that people returned from the United States were persecuted. That's an attempted social group. There's no proof of westernization being a targeted class. And academically, we can discuss that, but the question is this record. And on this record, the Board did not abuse its very broad discretion. And we can go round and round, and we may well be back here again in two years. But the question is – Kennedy, they would go round and round and do what? Well, the issue is when is the order final? When does the law get carried out? This Court already ruled in 2004, and now we're back. So there's no basis to do this again. The Board did not abuse this. In other words, the bottom line here is that you don't believe that country conditions have worsened. I do not, and the Board did not. And the Board cited reasons for why it concluded that. And those reasons are not arbitrary or capricious, and they are founded in the record, specifically a country condition report which says – which was before the Court in 2000 that said the very same thing as the 2003 report that was introduced as grounds for reopening. It may not be a great place, and the fact that it's still not a great place is not enough to reopen. Unless there are any other questions, I'll rely on our brief. I thought we had a kinder and better Justice Department. Your Honor, this Court made its decision in 2004. Thank you. Get a little fire in your belly, huh? Yes. Your Honor, the fact that the I.J. relied on the country conditions report and the fact that there were human rights violations in the record based on the human rights report in 1999 is the same – and the fact that those conditions are going on now is the same analysis that the Court rejected in Malti v. Ashcroft. In that case, the Court rejected the analysis that the circumstances were insufficient because they were a continuance of the circumstances. Counsel, do you agree that for us to get the result that you want, we have to change either our case law or the law generally? No, Your Honor. I believe that this Court does not have to change its holding of Malti v. Ashcroft. Malti – you're taking this stuff out of whole cloth, spinning a little part of the opinion without looking at the facts. I asked you before whether your client had been involved in Iran and doing these things. You admitted she has not. Our case law clearly requires that she do so. So I'm just asking you to stay straight out. You're asking us to, in effect, get this to an en banc so that we can change our case law, because short of that, as a three-judge panel, we have no ability to overturn our case law, do we? Well, no, Your Honor. No, Your Honor, but I – So under the circumstances, what your plea is, we don't like the case law that exists. We don't like the law. We'd like you to go en banc so that you can overrule what you've done before, because that's the only way we can give our client relief. Well, I – That's what you're saying, right? Well, what I'm saying – actually, Your Honor, I believe that the Malti v. Ashcroft decision is very similar to this case. But it's not – it's not counsel. Yes, it changed country conditions. It talks in general. But there you had somebody who was in country, who did the kinds of things that were the predicate for the relief that you're talking about. Your client has never done in Iran what serves as the predicate for this. You've admitted that. So I'm just asking you to be honest with the Court. You're asking us to change our case law to give your client relief. Isn't that correct? Again, Your Honor, our position is that the facts of Malti actually – and his persecution was based on religion, not so much on his involvement in politics. You're not answering my question. You're not answering my question. Where – what do we do with the predicate that somebody has to have had persecution in country before? What do we do with that? Again, well – Malti doesn't change that. Exactly. She didn't – even if she didn't have an asylum claim in 2000, Malti asked whether the critical question is whether she has an asylum claim now. But even if the country – even if it was, you know, totally changed over there, you still have to have had the predicate that she had to have been in Iran and done things that resulted in her previous persecution. That has not occurred here. You've admitted that. Right. But – Right? Well, yes, yes. But what we're asking – Aren't you asking us to change the rules? Not necessarily. We believe that these issues can be hammered and litigated if proceedings are reopened. And we can litigate and submit more evidence showing that – What happened in that other case? Excuse me, Your Honor? Malti's case. What were the facts? Well, that case, it was a – it was a Catholic – a Catholic-Catholic in Egypt in which his asylum case was denied. But subsequent to that, there were – evidence was submitted with the motion to reopen of intensified persecutions against Catholic Christians in Egypt. And based on this record, the Court found that there were sufficient changes for that – for reopening, that this was qualitatively different evidence meriting reopening. Similarly, in this case, we have submitted – the record shows that there is qualitatively different evidence of more persecution and more intense crackdown on women's rights and a restriction of the freedom for women in Iran. Also, one more thing that I'd like to point out. Government – the government – But you're – you're saying a person leaves the country and that person did not suffer what we'd call persecution there. And the person is in this country then for 20 years. And then conditions change in that country where there's at least a 10 percent chance that if this woman, who's lived in this country for 20 years and has adopted the culture of this country and fears that if she goes back to Iran that she will be persecuted. She's – she talked about women there that have expressed their views about women's rights, suffering torture, flogging, executions, beheadings, and lashings. That was in the record, wasn't it? Yes, sir. Yeah. And that – that – that's – those are her concerns and that the fact that somehow she had to be – undergo personal suffering and persecution at the time she left the country would foreclose an opportunity to reopen where there's drastic change in country conditions. That's – that's what basically you're saying, isn't it? Well, yes, Your Honor. The condition in Iran continues to worsen. And although not in the record, but as mentioned by the Court in the news – newspaper, we keep reading that the conditions over there are – With due respect, I'm grateful that we're all aware of what's going on in the world. But this is a court of law. And in a court of law, we – unless there's something of which we can take judicial notice, we're bound by the record, are we not? Yes, Your Honor. So I trust you're not suggesting that we ought to go out and get copies of the newspaper to make a decision. No. No, Your Honor. But I mention this because in government – in respondents' argument, these issues were raised and these facts were brought to light. And I just wanted to mention them in passing. I'm not – I'm – I'm – So you want us to notice them, but not officially? Well, not necessarily. Well, I – what I mean, Your Honor, is – also, one more thing that I'd like to point out is in the record, the government – the respondent relies on the – notes that the human rights conditions were deplorable – were deplorable in 1999. But the 2003 report does show that the conditions – that human rights conditions worsened in Iran. And that is submitted in the record in this way. Have you – have you researched the evidentiary rule on judicial notice? Yes, Your Honor. What? Yes, Your Honor. Yes. Okay. So what – in your view, what is that rule? Well, the court may – certain facts and events, the court may take judicial notice. Of what? Well, from what I remember, certain common – at least commonly known facts and very specific instances in which the court can do that. Yeah. All right. Time's up. Thank you, Your Honor. The matter is submitted. And now we'll go to the second case.
judges: Pregerson, Bybee, M Smith